# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 5, 2008

## STATE OF TENNESSEE v. GERMAINE WHITLEY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-00289      Chris Craft, Judge**

---

**No. W2007-00819-CCA-R3-CD  - Filed September 9, 2009**

---

Following a jury trial, Defendant, Germaine Whitley, was found guilty of first degree premeditated murder and first degree felony murder, which the trial court merged into a single conviction for first degree premeditated murder.  Defendant was sentenced to life with the possibility of parole.  On appeal, Defendant challenges the sufficiency of the evidence.  After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Robert Wilson Jones, District Public Defender; Donna Armstard, Assistant Public Defender; David Bell, Assistant Public Defender; and Garland Ergüden, Assistant Public Defender, Memphis, Tennessee, for the appellant, Germaine Whitley.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; Alonda Dwyer, Assistant District Attorney General; and Colin Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Background

Leona Taylor testified that the victim was her daughter, Shuntell Taylor, and the victim was nineteen years old when she died.  Ms. Taylor said that the victim lived with her until the victim moved into the Plumtree Apartments on July 2, 2004, to live by herself.  Ms. Taylor stated that the victim had one key to the apartment and that as far as Ms. Taylor knew, the victim never made any copies of the key.  Ms. Taylor purchased curtains for the apartment's kitchen and hung them up on July 4, 2004. Ms. Taylor identified a photograph of the curtains which showed blood on the curtains

as the one she purchased, and she stated that there was no blood on the curtains at the time of purchase. Ms. Taylor was concerned about the victim's safety and showed the victim where she had put her knives. Ms. Taylor told the victim that "the only security that you have is your knives." Ms. Taylor said that the victim drove a white 1998 Chevrolet Blazer.

Ms. Taylor stated that she last saw the victim on Sunday, July 11, 2004, when the victim came to her house for a visit. The victim stayed approximately two hours and left sometime before dark to visit Ade Barfield. Ms. Taylor talked to the victim again at approximately 10:40 p.m. while the victim was driving home, and Ms. Taylor lectured the victim about arriving home so late.

Ms. Taylor said that the victim was employed by Creative Computers, with her normal work hours being from 2:00 p.m. until approximately 11:00 p.m. The victim was scheduled to work the following day, Monday, July 12, 2004. When Mr. Barfield came over to her house looking for the victim, Ms. Taylor learned that the victim had not shown up for work. Ms. Taylor tried to reach the victim on her cell phone three times, but her calls were transferred to the victim's voice mail. Ms. Taylor and her two sons, Mickale and Terry, drove to the victim's apartment. Ms. Taylor said that the victim's white Blazer was parked crookedly in the parking lot space, which was uncharacteristic of the victim's driving habits. Ms. Taylor knocked on the apartment's front door, calling out the victim's name, but the victim did not respond. Ms. Taylor next knocked on the living room window and then the bedroom window. Ms. Taylor observed pry marks on the metal track around the bedroom window. Ms. Taylor knocked on the kitchen and bathroom windows but still did not get a response.

Ms. Taylor drove to John Michael Teal's apartment and asked him if he had heard from the victim. Mr. Teal told Ms. Taylor that the victim was supposed to call him that day, but he had not heard from her. Ms. Taylor and Mr. Teal left for the victim's apartment in separate cars, and Mr. Teal arrived at the apartment complex first. Mr. Teal was standing at the victim's open front door when Ms. Taylor arrived, and Mr. Teal told Ms. Taylor not to come into the apartment. Ms. Taylor's sons went into the apartment first, followed by Ms. Taylor. Ms. Taylor said that the victim was lying on her bed, dead. One of Ms. Taylor's sons called the police. Ms. Taylor said that she did not know Defendant.

On cross-examination, Ms. Taylor said that Mr. Barfield was the victim's former boyfriend, and the couple had broken off their relationship approximately two to three months prior to the victim's death. Ms. Taylor said that the victim left her house on July 11, 2004, because she received a cell phone call from Mr. Barfield. Ms. Taylor described her own relationship with Mr. Barfield as "good." Ms. Taylor acknowledged that she told the investigating officers that she did not like Mr. Barfield's living arrangements. Ms. Taylor visited Mr. Barfield's apartment once with the victim. Ms. Taylor said there were several men and women present who apparently were living in the apartment, and two men were smoking marijuana. Ms. Taylor turned around and left the apartment. Ms. Taylor said that she suspected that the victim was buying groceries for Mr. Barfield and his roommates. Ms. Taylor stated that she spoke to Mr. Barfield on July 12, 2004, and Mr. Barfield said

that he had also been to the victim's apartment looking for her. Mr. Barfield told Ms. Taylor that he knocked on the apartment's doors and windows, but the victim did not answer.

Ms. Taylor said that she noticed the victim's favorite necklace on the front seat of her car when Ms. Taylor looked into the vehicle's window on July 12, 2004. Ms. Taylor said that it was not like the victim to leave her jewelry in the vehicle. Ms. Taylor acknowledged that the victim's television, VCR and DVD player were still in the living room when they discovered the victim's body.

Ms. Taylor stated that the victim and Mr. Teal had been friends since the victim was sixteen but that they were not dating at the time of the offense. Ms. Taylor said that Mr. Teal would not look her in the eye when she told him that she was trying to find the victim on July 12, 2004, and Mr. Teal drove away from his house very fast. Ms. Taylor said that she did not believe that Mr. Teal had a key to the victim's apartment. Ms. Taylor said Mr. Teal's face expressed emotion when she arrived at the victim's apartment approximately fifteen minutes later, but he did not cry.

Ade Barfield testified that he met the victim at work, and they dated during April, May, and June 2004. Mr. Barfield stated that he was at the victim's apartment until 2:00 p.m. on Saturday, July 10, 2004. Mr. Barfield stated that he last saw the victim at work later that day, when the two of them worked from approximately 4:00 p.m. until 8:00 or 8:15 p.m. The couple did not have plans to get together after they finished work. Mr. Barfield said that he called the victim on Sunday, July 11, 2004. The victim told Mr. Barfield that she was going to her mother's house and that she would call him later that day. Mr. Barfield called the victim at approximately 12:30 a.m. on Monday, July 12, 2004. The victim told him that she was at a friend's house and would come over to his apartment. When the victim did not show up, Mr. Barfield went to her apartment at approximately 2:30 a.m. and knocked on the kitchen door. The victim did not respond, and he heard no noises inside the apartment. Mr. Barfield said that the kitchen door was locked. Mr. Barfield said that he observed that the television set in the victim's bedroom was on, and the victim's vehicle was in the parking lot. Mr. Barfield said that he left the apartment complex after two or three minutes.

Mr. Barfield called the victim later that morning, but his call was transferred immediately to voice mail. Mr. Barfield took a work break at 6:00 p.m. and drove over to the victim's apartment, but the victim did not answer the door. Mr. Barfield then drove to Ms. Taylor's house. After speaking with Ms. Taylor, Mr. Barfield returned to work. Mr. Barfield stated that he returned to the victim's apartment at approximately 10:00 p.m. and found police cars and an ambulance parked in front of the building. Mr. Barfield said that he voluntarily answered the police officers' questions. He consented to a search of his vehicle and the provision of a DNA sample.

Mr. Barfield said that he had been inside the victim's apartment only once on Saturday, July 10, 2004, and he did not notice any blood on the kitchen curtains. Mr. Barfield said that he had never met Defendant and had never sold or given drugs to him. Mr. Barfield stated that he did not remember Defendant changing a tire on a white SUV and denied ever letting Defendant into his

apartment. Mr. Barfield said that he was six feet tall and was twenty-five years old at the time the offense was committed.

On cross-examination, Mr. Barfield stated that he did not recollect telling the investigating officers that he had dated the victim for approximately seven months. Mr. Barfield said that he and the victim had broken off their relationship shortly before July 10, 2004, because they had argued over whether the victim was seeing someone else. Mr. Barfield stated that the couple resolved their differences on July 10, 2004, and parted friends. Mr. Barfield acknowledged that he and the victim had engaged in sexual relations while he was at her apartment. Mr. Barfield said that he did not have a key to the victim's apartment.

John Michael Teal testified that he met the victim when she was fifteen years old, and they dated for approximately three and one-half years. Mr. Teal stated that the couple had ended their relationship about three months before the victim died. Mr. Teal said that they argued because the victim thought Mr. Teal had damaged one of the Blazer's windows. Mr. Teal said that he and the victim made up their differences, but the victim told him they should "take a break" from their relationship. Mr. Teal and the victim, however, continued to talk on the telephone every day and occasionally went out. Mr. Teal said that he did not date anyone else during that period of time, and he did not know if the victim dated anyone.

Mr. Teal said that he visited the victim in her apartment approximately four times. Mr. Teal said that he saw the victim at a strip club with some friends on Saturday, July 10, 2004. Mr. Teal told the victim that he did not like her patronizing such a place. Mr. Teal left the club, and the victim sent him a text message some time later. Mr. Teal visited the victim in her apartment on Sunday afternoon, July 11, 2004, and they talked for approximately an hour and a half. Mr. Teal said that he entered the apartment through the kitchen door, but he did not look at the kitchen curtains.

Mr. Teal left the victim's apartment between 4:00 p.m. and 4:30 p.m. on July 11, 2004, because the victim told him that she was going to her mother's house to eat dinner. The victim called him three times that night because she wanted Mr. Teal to spend the night with her. The last call was placed at approximately 11:00 p.m. Mr. Teal told the victim that he was already asleep, and the victim told him she would have lunch with him the next day between 10:30 a.m. and 11:00 a.m. The victim did not show up for lunch, but Mr. Teal said he was not concerned. Mr. Teal called the victim five or six times that day without success.

Mr. Teal said that he first became concerned about the victim when Ms. Taylor came to his house and told him she could not reach the victim. Mr. Teal said that it was not unusual for the victim to miss a lunch date, but Mr. Teal knew that the victim frequently talked to her mother. Mr. Teal drove over to the victim's apartment and went to the back door. Mr. Teal said that he did not have a key to the victim's apartment, and the back door was locked. He went to the front door. Mr. Teal said that he started knocking on the door "real hard," and it "budged open." Mr. Teal went into the victim's bedroom, and saw her lying on the bed. Mr. Teal said that he could not breath or move

because he knew she was dead. Ms. Taylor and her sons arrived, and Mr. Teal told Ms. Taylor not to go into the bedroom. Mr. Teal said that he did not know Defendant.

On cross-examination, Mr. Teal denied that the victim was scared of him. Mr. Teal said that the argument which occurred approximately three months before her death was not physical, and he denied fighting with the victim's brother, Mikhale Taylor. Mr. Teal denied telling the victim's parents that he would stop seeing the victim if they would not call the police over this altercation.

Anthony Mullins testified that he was employed as a detective with the Memphis Police Department's homicide unit at the time of the offense. Detective Mullins said that he arrived at the victim's apartment on July 12, 2004, at approximately 10:30 p.m. Detective Mullins observed two holes in the living room drywall, two holes in the bedroom door, and the victim lying across her bed in the bedroom. Dective Mullins said that the victim had a laceration on the right side of her neck and several lacerations on her left hand. A later examination of the victim's body revealed more lacerations on the left side of her neck as well as missing fingernails and scratches. Detective Mullins said that the bed's comforter, pillows and stuffed animals were soaked with blood. A hole in the comforter which appeared to be a knife's penetration mark was found beneath the left side of the victim's neck. The victim's purse was laying next to her on the bed with her cell phone. Specks of blood were found on the dresser in the bedroom. One of the specks looked as if it had been wiped with some article.

Detective Mullins observed that dust had accumulated on the apartment's interior doors, but it appeared that the door panels had been wiped down. Detective Mullins also saw evidence of cleaning on the apartment's exterior bedroom window. Detective Mullins said that the bedroom window had double glass panes and an interior slide mechanism. A glass pane was missing from the exterior side of the bedroom window, the frame had scratch marks just below the lock, and there appeared to be partial fingerprints on the outside of the window. The scratch marks were not rusted and appeared to be fresh. The brick ledge below the bedroom window was three or four feet from the ground, and the victim's bed was positioned underneath the window. Detective Mullins stated that he did not observe any other signs of forced entry into the apartment.

Detective Mullins stated that one of the kitchen drawers was pulled out revealing numerous knives. There appeared to be blood on one of the large knives at the bottom of the pile of knives. Blood stains were also found on the kitchen curtains. Detective Mullins described them as transfer stains; that is, the blood was transferred from one surface, such as a hand, on to the curtains. A blood spot was discovered on the kitchen floor. Detective Mullins stated that all of the blood from the victim's wounds had pooled beneath her indicating that she was lying on the bed when the stabbing occurred.

Detective Mullins said that initially the victim's two boyfriends, John Michael Teal and Ade Barfield, were developed as suspects. DNA samples were taken from both men the morning after the victim's body was discovered. In May 2005, a buccal DNA swab was taken from each man.

-5-

Detective Mullins said that both men were cooperative, and Mr. Teal and Mr. Barfield also consented to a search of their vehicles.

Detective Mullins said that he also interviewed Taurus Harris because one of the last cell phone calls the victim received came from an address where Mr. Harris resided. Detective Mullins believed that he was a recent acquaintance of the victim.

In June 2005, the Tennessee Bureau of Investigation (TBI) relayed information to the Memphis Police Department which prompted an investigation of Defendant as a possible suspect. Detective Mullins said that Defendant was interviewed on June 7, 2005. After he was read his Miranda rights, Defendant agreed to talk with the investigating officers. Defendant acknowledged that he had lived in the Plumtree Apartments from the first of July 2004 until sometime in August 2004. Defendant stated that he did not know the victim and had never been in her apartment. Defendant said that there was no reason that any of his hair, blood, or any other DNA specimen from him should be found in the victim's apartment. Defendant agreed to give a DNA sample, and the investigating officers informed Defendant that his DNA was found at the crime scene. Defendant denied any knowledge of how his DNA was left in the victim's apartment. The interview terminated, and Defendant was placed under arrest.

On December 2, 2005, after the preliminary hearing, Defendant called the homicide unit from jail and asked for an interview. Detective Mullins said that Defendant was brought to the police station on December 5, 2005, executed a written waiver of his Miranda rights, and gave a written statement. Detective Mullins stated that Defendant read his statement and then signed it after making no changes. In his statement, Defendant denied that he knew the victim or that he was the person who killed her. Defendant said that he did not know who was responsible for the victim's death. Defendant said that he had been in an apartment in the complex in which someone named "Day Day" or "Aday" resided. Defendant described Day Day/Aday as five feet, seven inches tall, nineteen to twenty-one years old, with a medium brown skin tone. Defendant said that he met Day Day/Aday in front of his apartment and bought marijuana from him. On July 9, 2004, Defendant said he was "fixing a tire" on a white "GMC Blazer or Jimmy" and scrapped his hand on the ground. Defendant noticed that his hand was bleeding when he "was getting ready to roll a blunt up." Defendant said that he started to go to Ms. Marilyn Joyner's apartment, but Day Day/Aday told him he could go into his apartment. Defendant said Day Day/Aday opened the apartment door for him, and Defendant washed his hands at the kitchen sink. Defendant said that he did not go into any other rooms in the apartment. Defendant said that he did not see the man again after that incident.

Detective Mullins described Mr. Barfield as five feet, nine or ten inches tall, twenty-two or twenty-three years old, with medium to dark skin tone. Detective Mullins said that Defendant's DNA matched the DNA sample taken from the curtains in the victim's kitchen. The DNA samples taken from the victim's bedroom partially matched Defendant's DNA profile.

On cross-examination, Detective Mullins said that he did not recollect that they were able to make a positive identification from any of the fingerprints found at the crime scene. Detective

-6-

Mullins stated that some of the slats of the blinds covering the bedroom window were askew, but he did not recollect that any were bent or broken. Detective Mullins said that one panel of the bedroom curtains hung straight down from the rod while the other panel was pulled back and secured with a tie back. Detective Mullins said that the tie back for the straight curtain was still attached to a hook in the wall. Detective Mullins acknowledged that no knick-knacks, photographs, or lamps in the bedroom appeared to have been disturbed. Detective Mullins said that it did not appear that any items of clothing were missing from the victim's body.

Marilyn Joyner testified that she lived in the Plumtree Apartments in July 2004. Ms. Joyner said that she met Defendant through an internet chat room, and he moved into her apartment in late June 2004. Ms. Joyner stated that she worked at Federal Express from 6:00 a.m. to 2:00 p.m. Defendant was not employed at the time, and Ms. Joyner did not know how Defendant spent his time while she was at work. Ms. Joyner did not know the victim, but she said that Defendant told her that a young woman who lived in the apartment complex was "nice looking," and that he and the young woman had "made eye contact." Ms. Joyner denied that she had any overnight guests during July 2004. Ms. Joyner said that she asked Defendant to move out of her apartment sometime in August because he had made no effort to secure employment.

Betty Johnson testified that she worked for the company who managed the Plumtree Apartments. Ms. Johnson said that it was the company's routine procedure to inspect an apartment for mechanical problems or damage before a new tenant moved in. Ms. Johnson stated that if a window pane was broken, for example, the company would repair it. Ms. Johnson said that the front and back doors of the victim's apartment were not accessible from the street but were located in separate interior hallways.

On cross-examination, Ms. Johnson said that she was not responsible for managing the Plumtree Apartments at the time of the offense and did not have any knowledge of whether any windows had been repaired prior to the victim moving in.

Terry Taylor, the victim's father, testified that he performed any repairs to the victim's Blazer that were required. He stated that the spare tire was not one of the four tires on the victim's white Blazer when she died. Mr. Taylor said he was driving the Blazer during the winter after the victim's death and hit an icy patch. The vehicle spun around, and a sharp piece of ice pierced one of the tires. Mr. Taylor said that when he opened the trunk to change the tire, he observed that both the jack and the spare tire appeared to have never been used.

Tabatha Bender, a customer operations manager for Crickett Communications, testified that she was responsible for maintaining customer cell phone records. Ms. Bender said that her records reflected that the victim's last completed call was placed at 12:05 a.m. on Monday, July 12, 2004, and lasted thirty-two seconds. A second call from the victim's cell phone was placed at 1:09 a.m. but was not completed. The numbers "3" and "4" were dialed before the call was disconnected. No other cell phone calls were made from that cell phone number after July 12, 2004.

Officer Ricky Davison with the Memphis Police Department's crime scene investigation unit assisted with the collection of evidence at the crime scene. Officer Davison identified a photograph showing pry marks on the exterior of the victim's bedroom window. Officer Davison stated that the partial fingerprints found on the window were not of sufficient quality to permit a comparison analysis. Officer Davison said that the bedroom window was large enough to allow someone to enter the bedroom. Officer Davison said that he collected ten blood samples from various areas in the victim's apartment, particularly her bedroom.

On cross-examination, Officer Davison said that he did not recollect examining the victim's bedroom window from the inside. He also did not remember if he had measured the distance between the ground and the window sill of the bedroom window. Officer Davison acknowledged that he did not dust the inside of the bedroom window for fingerprints.

Francis Donald Carpenter testified that he was employed by the Memphis Police Department and his responsibilities included processing the evidence collected from a crime scene. Officer Carpenter stated that of the items which he examined from the crime scene at the victim's apartment, partial fingerprints were only recovered from two drinking glasses found in the kitchen sink, an empty "Crickett" box found inside a closet near the bathroom, an empty DVD movie case found on the dresser in the bedroom, and a small glass found in the victim's Blazer. These items were forwarded to the latent print identification unit for processing. Officer Carpenter said that he dusted the interior and exterior of the bedroom window and each slat of the blinds without success. Officer Carpenter also did not find any fingerprints on the tools or jack in the Blazer's trunk.

Officer Martin Milner, a latent print examiner with the Memphis Police Department, testified that he received eighteen fingerprints from the crime scene investigation unit for examination, and none of the fingerprints matched Defendant's fingerprints.

Lieutenant Doreen Shelton testified that she was a member of the Memphis Police Department's homicide unit at the time of the offense and served as the case coordinator. Lieutenant Shelton stated that "[t]here was a lack of fingerprints on the scene altogether," even the "everyday prints" that should have been present. Lieutenant Shelton said the absence of fingerprints generally indicated that someone had cleaned up the crime scene. Lieutenant Shelton talked with Defendant before his interview with Sergeant Mullins on December 5, 2005. She said that Defendant told her he asked for the meeting because he wanted to explain why his DNA was on the victim's curtains. Defendant explained to Lieutenant Shelton that he had cut his hand while changing a tire on a white SUV, and he showed Lieutenant Shelton a scab on his hand. Lieutenant Shelton thought it strange that Defendant would still have a scab from a scrape which occurred a year earlier. Lieutenant Shelton stated that when Defendant was arrested in June 2005, he was allowed to make one telephone call, and Defendant called Joyce Smith.

Sergeant Barry Banks, with the Memphis Police Department, testified that he was one of the officers called to process the crime scene on the night that the victim's body was discovered. Sergeant Banks said that it appeared that the apartment had been wiped down and cleaned. He said

that the marks on the bedroom and closet doors and the bedroom window indicated that the surfaces had been cleaned with a wet rag. Sergeant Banks said that the blood-stained knife in the kitchen cabinet drawer was covered up by the other knives in the drawer.

Margaret Bash testified that she was employed by the TBI's Crime Laboratory as a special agent in the field of serology and DNA analysis and also served as a custodian of the T.B.I.'s records. Special Agent Bash stated that Special Agent Robert McFadden, who retired from the T.B.I. prior to trial, was a latent print examiner for the crime laboratory at the time of the offense and performed an examination of the items taken from the crime scene. These items included a knife, a kitchen cabinet drawer, a cigar wrapper and cigar butt, and the curtains from the victim's kitchen. Special Agent Bash said that Special Agent McFadden was not able to isolate any latent fingerprints on any of the items.

Special Agent Bash stated that she performed a serology and DNA analysis on several items from the crime scene. Special Agent Bash said that vaginal, oral, and anal swabs from the victim did not reveal the presence of semen. The nail scrapings from Mr. Teal and Mr. Barfield did not reveal the presence of blood. No blood was detected on the kitchen cabinet drawer, the cigar wrapper and butt, the towel found in Mr. Barfield's vehicle, or the roll of paper towels found in the dumpster at the victim's apartment complex. A roll of toilet paper taken from the dumpster, however, showed the presence of blood.

Special Agent Bash said that she determined that the reddish-brown substance found on the kitchen knife was blood, but the sample was not large enough to perform a DNA analysis. Special Agent Bash stated that her examination of the victim's kitchen curtains revealed the presence of blood. She was able to construct a DNA profile from the sample and said that the contributor of the sample was male.

Special Agent Bash entered the profile into the Combined DNA Index System ("CODIS") which revealed a match with Defendant's DNA profile. Special Agent Bash said that she performed a DNA analysis of the buccal swabs taken from Defendant, Mr. Teal, and Mr. Barfield. She determined that the DNA profile obtained from the kitchen curtains did not match either Mr. Teal's or Mr. Barfield's DNA profile, but it did match Defendant's DNA profile. Special Agent Bash stated that the probability of another individual having the same DNA profile as Defendant was one in 1.89 quintillion.

Special Agent Bash said that she was asked to perform an additional DNA analysis on other items found at the crime scene in November 2006. A swab taken from the victim's bedroom dresser revealed the presence of blood which matched one genetic marker of Defendant's DNA profile. Special Agent Bash stated that one in ten African-American males shared the genetic marker found in the sample. A second blood sample taken from the dresser matched six of Defendant's genetic markers. The probability of an unrelated African-American male having the same six genetic markers was one in three hundred and twenty-seven million. A blood sample from the footboard of the victim's bed matched five of Defendant's genetic markers. Special Agent Bash said that the

probability of another African-American male having the same five genetic markers was one in three million, six hundred thousand. Special Agent Bash examined a second blood sample from the kitchen curtains which also matched five of the genetic markers of Defendant's DNA profile. Special Agent Bash said that none of the blood samples which revealed a DNA profile matched either Mr. Teal's or Mr. Barfield's DNA profile. On cross-examination, Special Agent Bash stated that no DNA test revealed the age of the blood sample.

Dr. Amy R. McMaster testified that she was employed by Forensic Medical, a private company which provided forensic services for various counties throughout Tennessee. Dr. McMaster performed an autopsy on the victim on July 13, 2004. The victim had one wound on the right side of her neck which was four and three-fourth inches deep, two inches long, and one inch wide. Dr. McMaster said that the instrument inflicting the wound continued to the other side of the victim's neck severing both carotid arteries and both jugular veins. Dr. McMaster stated that the injury was fatal and was consistent with a knife wound. The victim also had three superficial wounds on her neck, none of which was fatal.

Dr. McMaster said that the palm of the victim's left hand revealed a deep incised wound on the little finger, an incised wound on the tip of her thumb, and an incised wound on her ring finger. The palm of the victim's right hand revealed a laceration to the right thumb and the tip of the right thumb. Dr. McMaster classified the wounds as "defense wounds." A toxicology screen did not reveal the presence of any drugs or alcohol in the victim's system. On cross-examination, Dr. McMaster stated that she did not see any bruising or swelling on the victim's neck.

The State rested its case-in-chief, and Defendant presented his defense. George Cunningham testified that the victim came to his house twice on July 11, 2004, to visit Taurus Harris who was staying with Mr. Cunningham at the time. The first visit was between 2:00 p.m. and 5:00 p.m. The victim arrived the second time between 11:00 p.m. and 12:00 p.m., and left at approximately 12:30 a.m. or 1:00 a.m.

On cross-examination, Mr. Cunningham said that Mr. Harris was from Blytheville, Arkansas. Mr. Cunningham stated that Mr. Harris was approximately five feet nine inches tall, wore his hair in dreadlocks, and had a moustache. Mr. Cunningham said that Mr. Harris did not drive, and Mr. Harris remained at Mr. Cunningham's house after the victim left early in the morning on July 12, 2004. Mr. Cunningham gave the investigating officers Mr. Harris' contact information, and he believed that Mr. Harris talked to the officers as soon as he was contacted.

Joyce Smith testified that she was Defendant's girlfriend at the time of the offense. Ms. Smith said that she spoke to Defendant on Sunday, July 11, 2004, between 6:00 p.m. and 7:00 p.m. Ms. Smith stated that she picked Defendant up at his apartment at approximately 10:00 p.m. and was with him until approximately 4:30 a.m. on Monday, July 12, 2004. Ms. Smith said that she and Defendant drove to a park and talked for awhile and then visited Defendant's cousin. Ms. Smith stated that she picked Defendant up later that morning at approximately 10:00 a.m. and took him to a hotel where Defendant obtained a room. Ms. Smith left Defendant to run errands and returned to

the hotel at approximately 3:00 p.m. Ms. Smith said that she and Defendant spent the night at the hotel and checked out the following day. Ms. Smith said that she paid for the hotel room, and the receipt issued in Ms. Smith's name was introduced as an exhibit at trial. The receipt indicates that Ms. Smith checked into the hotel on July 12, 2004, at 10:00 a.m., and checked out on July 13, 2004, at 12:22 p.m.

On cross-examination, Ms. Smith said that she first began talking with Defendant in an internet chat room in March 2004, but they did not actually meet until June 2004. Ms. Smith said that Defendant was living with his cousin when she first met him, but he moved into Ms. Joyner's apartment at the Plumtree Apartments at some point in June 2004. Ms. Smith said that Defendant told her that Ms. Joyner was a family friend, but Ms. Smith never met her. Ms. Smith stated that Defendant told her that he needed to rent a hotel room on July 12, 2004, because Ms. Joyner was having company. Ms. Smith acknowledged that Defendant had several family members living in the Memphis area. She said that she only rented a hotel room for Defendant that one time. Ms. Smith acknowledged that her testimony at the preliminary hearing that she picked Defendant up on the morning of Sunday, July 11, 2004, was incorrect because she was at church until approximately 6:00 p.m.

Ms. Smith stated she was aware that she was the first person Defendant called after his arrest. In that telephone call, Defendant told Ms. Smith to obtain a copy of the hotel receipt for the night of July 12, 2004, which she did. Ms. Smith acknowledged that she did not testify at the preliminary hearing that she was with Defendant on July 11, 2004, until 4:00 a.m. on July 12, 2004. Ms. Smith acknowledged that she only knew about Ms. Joyner's house guests on July 12, 2004, from Defendant. Ms. Smith said that she believed that she was the only person Defendant had met in an internet chat room.

Tiffany Whitley, Defendant's sister, testified that her brother, Christopher Whitley, died in March 2004, leaving an insurance policy in the amount of $86,000. Ms. Whitley said that she and her four brothers were equal beneficiaries under the policy. After deducting funeral and other expenses, Ms. Whitley stated that she and her brothers, including Defendant, each received approximately $15,000 at the end of May or in early June 2004.

Mickale Taylor, the victim's brother, testified that Mr. Teal was the victim's former boyfriend. Mr. Taylor acknowledged that he told the police that he broke up a fight between the victim and Mr. Teal a few months before the victim was killed. Mr. Taylor stated, however, that by the word "fight," he mean an argument, not a physical altercation. Mr. Taylor said that he woke up and saw the victim standing in the front doorway arguing with Mr. Teal about the victim's car. Mr. Taylor pulled the victim back into the house, at which point Mr. Teal left.

Leona Taylor testified that after the altercation between the victim and Mr. Teal over the victim's car, Ms. Taylor told Mr. Teal that she did not want him having any more contact with the victim. Ms. Taylor told him that if he did, she would call the police. Ms. Taylor stated that when she talked to the victim after the incident with Mr. Teal at the strip club, the victim said that she was

scared of Mr. Teal. On cross-examination, Ms. Taylor acknowledged that she had never seen the victim and Mr. Teal argue, and that the victim and Mr. Teal stayed in contact after the incident at the strip club.

## II. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his conviction of first degree premeditated murder. Defendant submits that Ms. Smith testified that Defendant was with her from approximately 10:00 p.m. on Sunday, July 11, 2004, until 4:00 a.m. on Monday, July 12, 2004. Leona Taylor testified that she talked with her daughter, the victim, at 10:40 p.m. on July 11, 2004. Therefore, Defendant argues, the victim was alive when Ms. Smith picked him up on Sunday. Defendant also points out that he explained that the presence of his DNA on the victim's kitchen curtains was attributed to his washing his hands in the kitchen sink after scrapping his hand while he changed the tire of a white SUV.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn.1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

The offense of first degree premeditated murder is "a premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). An act is premeditated if the act is "done after the exercise of reflection and judgment." Id. at (d). Furthermore,

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

The element of premeditation is a question of fact for the jury to determine based upon consideration of all of the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). "Because premeditation involves the defendant's state of mind, concerning which there is often no direct evidence, Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence." State v. Davidson,121 S.W.3d 600, 614 -616 (Tenn. 2003) (citing State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992)). Our supreme court has provided a list of non-exclusive circumstances that would justify a jury in finding or inferring premeditation: the use of a deadly weapon on an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill the victim; the defendant's procurement of a weapon; preparations taken to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and the defendant's calm demeanor immediately after the killing. State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998); Bland, 958 S.W.2d at 660. A jury, however, is not limited to any specific evidence when determining whether a defendant intentionally killed the victim "after the exercise of reflection and judgment." See T.C.A. § 39-13-202(d). All of the circumstances of the offense and the defendant's conduct may be considered in determining whether the act was premeditated. Davidson, 121 S.W.3d at 615 (citing State v. LaChance, 524 S.W.2d 933, 937 (Tenn. 1975)).

Viewing the evidence in a light most favorable to the State, Ms. Joyner's testimony and Defendant's admission in his initial statement to the investigating officers placed Defendant in the vicinity during the time frame of the commission of the offenses. The attack on the unarmed victim was brutal, and the instrument which caused the fatal wound was wielded with such strength that it completely pierced the victim's neck and entered the bedding beneath her. The victim had numerous defensive wounds on both hands. There was, however, no sign of a struggle in the apartment, and none of the framed photographs or knick-knacks near the victim's bed were disturbed. Detective Mullins and Sergeant Banks testified that there were signs that the exterior side of the bedroom window and the interior doors had been wiped down with some sort of wet cloth. A spatter of blood on the victim's dresser also appeared to have been wiped with some object. Lieutenant Shelton testified that the absence of any fingerprints at the crime scene, including the everyday fingerprints one would expect to find, indicated that the crime scene had been cleaned after the commission of the crime.

Defendant's DNA was found on the blood-stained kitchen curtains. A large knife with traces of blood on its blade was found in a kitchen cabinet buried beneath several other knives. Dr. McMaster testified that the fatal wound to the victim was consistent with the use of a knife similar to that found in the victim's kitchen.

At the time he was arrested, Defendant denied that he knew the victim or that he had ever been in her apartment. After the preliminary hearing, Defendant asked for a meeting with the investigating officers to explain why his DNA was found on the kitchen curtains. Defendant stated that he cut his hand while changing the tire on a white SUV and that he washed his hands in an apartment rented by someone he knew as "Dada" or "Ade." Defendant denied that he was in any other room of the apartment. Mr. Barfield denied that he knew Defendant or that he had let him into

the victim's apartment. DNA samples taken from the victim's bedroom partially matched Defendant's DNA profiles. None of the DNA samples recovered from the crime scene matched either Mr. Teal's or Mr. Barfield's DNA profile. On Monday, July 12, 2004, Defendant asked Ms. Smith to rent a hotel room for him. Although he told Ms. Smith that he needed a hotel room because Ms. Joyner was having overnight guests, Ms. Joyner testified that she did not have any overnight guests during July 2004.

We acknowledge that Defendant presented alibi evidence that he was with Ms. Smith from approximately 6:00 p.m. on Sunday, July 11, 2004, until 4:00 a.m. on Monday, July 12, 2004. However, it was within the jury's prerogative to reject defendant's alibi defense. See State v. Cate, 746 S.W.2d 727, 729 (Tenn. Crim. App. 1987) (noting the defense of alibi and the question of identification are determinable by the jury as the exclusive judges of the credibility of the witnesses).

Based on a thorough review of the record, we conclude that the facts and circumstances as a whole were sufficient for a rational trier of fact to have found the elements of premeditated first degree murder beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

**CONCLUSION**

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-14-